## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MOSHOOD ALABI BALOGUN, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALEJANDRO MAYORKAS, Secretary of )<br>the United States Department of Homeland )<br>Security; UR MENDOZA )<br>JADDOU, Director of the United States )<br>Citizenship and Immigration Services )<br>("USCIS"); MICHAEL CATALANO, )<br>the USCIS District Director of the )<br>Philadelphia USCIS field office; and )<br>MERRICK GARLAND, Attorney General )<br>of the United States,[1] )<br><br>Defendants. ) | Civil Action No. 23-1162-MN |

## REPORT AND RECOMMENDATION

This case involves Plaintiff Moshood Alabi Balogun's ("Plaintiff" or "Balogun")

challenge to the denial of his Form I-130, Petition for Alien Relative ("Balogun's petition"), on

behalf of his wife, Kofoworola Lawal ("Lawal"), a citizen of Nigeria.  Presently pending before

the Court is the motion for summary judgment ("motion") filed by Defendants Alejandro

Mayorkas, Secretary of the United States Department of Homeland Security ("DHS"); Ur

Mendoza Jaddou, Director of the USCIS; Michael Catalano, the USCIS District Director of the

Philadelphia USCIS field office; and Merrick Garland, the Attorney General of the United

---

[1]        Plaintiff named Tony Bryson, the former USCIS District Director of the
Philadelphia USCIS field office, as a Defendant in this action.  (D.I. 1)  Pursuant to Federal Rule
of Civil Procedure 25(d), Michael Catalano, the current USCIS District Director of the
Philadelphia USCIS field office, is substituted for Mr. Bryson.  (D.I. 11 at 1 n.1)

States.  (D.I. 10)  For the reasons set forth below, the Court recommends that the District Court

GRANT Defendants' motion.

## I.      BACKGROUND

The Court first provides brief background regarding the relevant immigration statutory

and regulatory framework, followed by the factual and procedural background relating to

Plaintiff's claims.

### A.      Immigration Statutes and Regulatory Framework

A United States citizen may file a Form I-130 Petition for Alien Relative ("Form I-130

petition") with the USCIS to obtain lawful permanent resident status for his alien spouse, who is

the "beneficiary" of the petition.  8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. §§ 204.1(a)(1),

204.2(a)(1); *see also Young v. Bausman*, CIVIL ACTION NO. 19-1870, 2020 WL 996423, at *5

(E.D. Pa. Mar. 2, 2020).  The USCIS then conducts an investigation to determine whether to

approve or deny the Form I-130 petition.  8 U.S.C. § 1154(b); 8 C.F.R. § 204.2.  If the USCIS

grants a Form I-130 petition, the beneficiary is classified as an "immediate relative" who may

seek adjustment of status to permanent residence by filing an I-485 application in order to obtain

a green card.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1255(a); *see also Bristow v. Mayorkas*, No. 22 C

991, 2024 WL 1328825, at *1 (N.D. Ill. Mar. 28, 2024).

However, pursuant to Section 204(c) ("Section 204(c)") of the Immigration and

Nationality Act ("INA"), the USCIS is barred from granting such a petition if there is

"substantial and probative evidence" that the alien spouse has attempted to, conspired to or

actually "enter[ed] into a marriage for the purpose of evading the immigration laws" (i.e., a

"sham marriage").  8 U.S.C. § 1154(c); 8 C.F.R. § 204.2(a)(1)(ii).  This bar also applies if any

prior marriage of the alien spouse is found to have been entered into for the purpose of evading

2

immigration laws.  8 U.S.C. § 1154(c); 8 C.F.R. § 204.2(a)(1)(ii); *see also Mukui v. Chau*, Case No. 19-cv-03249-JMY, 2020 WL 3265156, at *2 (E.D. Pa. June 17, 2020), *aff'd, Mukui v. Dir. U. S. Citizenship & Immigr. Servs. Phila. Dist.*, 852 F. App'x 704 (3d Cir. 2021).  In this context, "substantial and probative evidence" is "higher than a preponderance of the evidence and closer to clear and convincing evidence[;]" put another way, "the evidence must establish that it is more than probably true that the marriage is fraudulent." *Matter of P. Singh*, 27 I. & N. Dec. 598, 607 (B.I.A. 2019); *see also Watson v. Att'y Gen. of the U.S.*, Civil Action No. 21-20303 (ZNQ), 2024 WL 3159320, at *2 (D.N.J. June 25, 2024).  When evaluating whether a marriage was bona fide, the "central question" is whether the parties "intended to establish a life together at the time they were married." *Matter of Laureano*, 19 I. & N. Dec. 1, 2-3 (B.I.A. 1983); *see also Mukui*, 852 F. App'x at 707.[2]  If the USCIS determines that the marriage is fraudulent, then the burden shifts to the Form I-130 petition applicant to establish that the marriage was not fraudulent.  8 C.F.R. § 204.2(a)(1)(i)(C); *Mukui*, 2020 WL 3265156, at *2.  After receiving any such responsive evidence, the USCIS will then decide whether to approve or deny the petition.  *Mukui*, 2020 WL 3265156, at *2.

If the USCIS denies a Form I-130 petition, the applicant can appeal the denial to the Board of Immigration Appeals ("BIA").  8 C.F.R. § 1003.1(b)(5), (d)(3); *Mukui*, 2020 WL 3265156, at *2.  The applicant may then challenge an unfavorable decision by the BIA in a federal district court.  *Mukui*, 2020 WL 3265156, at *2.

### B.    Factual Background

---

[2]    "The conduct of a couple after their marriage is relevant to the extent that it bears upon their subjective state of mind at the time they were married." *Elbeialy v. Mayorkas*, Case No. 2:22-cv-02778-ODW (JEMx), 2023 WL 9420529, at *7 (C.D. Cal. Nov. 30, 2023) (internal quotation marks and citation omitted).

3

### 1.      Facts regarding Lawal and her marriage to Rakin Muhammad ("Muhammad")

On January 3, 2001, a Nigerian citizen by the name of Kofoworola Idayat Laguda applied for a student visa (the "Laguda application") to attend Temple University in Philadelphia, Pennsylvania.  (D.I. 6 (hereinafter, "Tr.") at AR000271-72)  The applicant listed her date of birth as March 26, 1979.  (*Id.* at AR000272)  The USCIS denied that application on March 1, 2001.  (*Id.* at AR000271-72)  On January 7, 2002, a Nigerian citizen applied for a student visa to attend Temple University under the name Kofoworola Lawal (the "Lawal application").  (*Id.* at AR000271-73)  The applicant listed her date of birth as March 26, 1982.  (*Id.* at AR000272)  The Lawal application included a photograph and signature that was nearly identical to the prior Laguda application.  (*Id.*)  The USCIS granted the Lawal application.  (*Id.* at AR000271-72)

On June 3, 2003, Lawal married Muhammad, an American citizen.  (*Id.* at AR000525)  In December 2003, Muhammad filed a Form I-130 petition and Lawal filed a Form I-485 petition to pave the way for Lawal to obtain a green card.  (*Id.* at AR000118, AR000504-08, AR000516-23)  On February 25, 2005, Muhammad and Lawal were interviewed at the USCIS office in Philadelphia to determine whether their marriage was bona fide (the "2005 interview").  (*Id.* at AR000267)  Muhammad and Lawal testified that they lived together in Philadelphia full-time and provided documentation relating to their marriage.  (*Id.* at AR000047, AR000118, AR000267, AR000524-635)  In light of the testimony and evidence, the USCIS determined that Muhammad's and Lawal's marriage was bona fide and the I-130 and I-485 petitions were approved on the same date as their interview.  (*Id.* at AR000497-98)  Because Muhammad and

Lawal had been married for less than two years, Lawal was only granted conditional lawful permanent resident ("CLPR") status. *See* 8 U.S.C. § 1186a.

When a noncitizen obtains CLPR status, the USCIS is given another opportunity to review the authenticity of the noncitizen's marriage. 8 C.F.R. § 216.3. Within 90 days of the second anniversary of the noncitizen's receipt of CLPR status, the noncitizen and her spouse are required to file a joint Form I-751 petition that establishes that: (1) the marriage was legal where it took place; (2) the marriage has not been terminated; (3) the marriage was bona fide and was not a sham marriage to evade immigration laws; and (4) no fee (other than fees paid to an attorney to assist with the filing) has been paid in connection with the petition. 8 C.F.R. § 216.4(a) & (c). In November 2006, Muhammad and Lawal jointly filed a Form I-751 petition ("Lawal's Form I-751 petition") to remove conditions on Lawal's residence, representing that they resided together at Godfrey Avenue in Philadelphia, Pennsylvania (and would be residing together at Liborio Lane in Smyrna, Delaware beginning in March 2007). (Tr. at AR000312-13)

Shortly thereafter, on December 15, 2006, the USCIS received a tip letter from an anonymous source accusing Lawal of entering into a sham marriage (with an unknown third party named Bamidele Lawal) "for the purpose of [] obtaining [a] green card." (*Id.* at AR000308) The letter alleged that Lawal's "real name is Kofoworola Laguda. She is a fraud." (*Id.*) This led the Fraud Detection and National Security Unit ("FDNS") of the DHS to begin an investigation to determine whether Lawal's marriage to Muhammad was bona fide. (*Id.* at AR000270-71)

On August 3, 2007, Muhammad and Lawal were separately interviewed at the USCIS Field Office in connection with Lawal's Form I-751 petition (the "2007 interview"). (*Id.* at AR000273) Lawal stated that she had lived with Muhammad at three different addresses

5

(Crescentville Road in Philadelphia from 2005 to 2006, Godfrey Avenue in Philadelphia from March 2006 to March 2007 and at the Smyrna address beginning in March 2007). (*Id.* at AR000273-74) However, during Muhammad's 2007 interview, he did not list the Crescentville Road address, and testified that he lived at Godfrey Avenue beginning in December 2003. (*Id.* at AR000273) He stated that Lawal had lived at the Crescentville Road address with a female roommate. (*Id.* at AR000274) Both Muhammad and Lawal claimed during the 2007 interview that they lived together at the Smyrna address in August 2007. (*Id.* at AR000273)

Lawal identified another man, Thompson Ajayi, also known as Ayo Ajayi ("Ajayi"), as her "guardian in the USA" during the 2007 interview. (*Id.*) She did not state that she lived with Ajayi, but Muhammad disclosed that Ajayi lived with the couple at the Smyrna address. (*Id.*) For his part, Ajayi had submitted an affidavit dated November 22, 2006 in support of Lawal's Form I-751 petition; in that affidavit, Ajayi stated that he lived in Baltimore, Maryland and that Lawal was his "niece" (and Muhammad was his "friend and in-law"). (*Id.* at AR000482)

During the 2007 interview, Lawal stated that she had no children anywhere in the world; in the interview, Lawal did not disclose that she was then six months pregnant. (*Id.* at AR000274) On November 27, 2007, Lawal gave birth to Ajayi's child, Morountodun Aymide Ajayi. (*Id.*)

On March 12, 2012, Lawal and Muhammad appeared for separate interviews with an FDNS investigator (the "2012 interview"). (*Id.* at AR000271-81) During the 2012 interview, Lawal claimed that she had never used any names other than Kofoworola Lawal. (*Id.* at AR000272) But she also admitted that the photographs on both the Laguda application and Lawal application (which each sought a student visa to attend Temple University) were hers, and that the signatures on both applications were her signature. (*Id.*) She could not offer a cogent

6

explanation as to why both applications contained her photographs and signatures (but presented different names and dates of birth). (*Id.*)

With respect to their residential history, Lawal and Muhammad gave different accounts during their 2012 interviews as compared to what they had said during prior interviews. During the 2005 and 2007 interviews, for example, Lawal claimed to have always lived with Muhammad. But during the 2012 interview, Lawal newly represented that she and Muhammad had never lived together (with Muhammad also stating the same). (*Id.* at AR000267, AR000275) Instead, this time Lawal asserted that during the marriage, she resided at the Crescentville Road and Godfrey Avenue addresses, while Muhammad lived in Baltimore, Maryland due to his work. (*Id.* at AR000275) Muhammad, meanwhile, testified that he lived at Godfrey Avenue from 2004 through 2006, and then at two different Maryland addresses from 2006 through the date of the interview. (*Id.*)

As for his employment history, during the 2012 interview Muhammad testified that he worked at the Charles Hickey School in Baltimore from 2004 through 2008 and then at the Fortress Group Home ("Fortress") in Baltimore from 2008 until October 2011. (*Id.*) For her part, Lawal said that she could not remember when Muhammad worked at the Charles Hickey School and recounted that he worked at Fortress only for "a month or two." (*Id.*) Both Lawal and Muhammad were asked why they did not move in together in October 2011 when Muhammad stopped working at Fortress. They each gave different answers. Lawal stated that she was in Nigeria from October 2011 through January 2012, while Muhammad said that they did not move in together then because of his son's legal problems. (*Id.*)

Additionally, Muhammad's testimony regarding Ajayi during the 2012 interview differed from what he had said in a prior interview. For example, during his 2007 interview, Muhammad

reported that Ajayi lived with the couple at that time.  But during the 2012 interview, Muhammad first claimed that he had no knowledge of who Ajayi was, and that he did not know that Ajayi was the father of Lawal's child.  (*Id.* at AR000276)  Then, when questioned further, Muhammad admitted that he in fact knew Ajayi, had worked for him, and had associated with him at the Smyrna address.  (*Id.*)

On March 15, 2012, the FDNS concluded that, based on the numerous misrepresentations and discrepancies in their stories, Lawal's and Muhammad's marriage was fraudulent, entered into solely to evade immigration laws.  (*Id.* at AR000266, AR000268, AR000276)  On April 26, 2012, the USCIS issued a decision denying Lawal's Form I-751 petition on this ground.  (*Id.* at AR000264-69)

### 2.    Lawal's marriage to Plaintiff

On March 2, 2016, Lawal and Muhammad divorced.  (*Id.* at AR000047)  Shortly thereafter, on June 11, 2016, Lawal married Balogun, a United States citizen.  (*Id.*)  On May 1, 2019, Balogun's Form I-130 petition was filed on Lawal's behalf so that Lawal could acquire a green card.  (*Id.*; *see also id.* at AR000045)  Lawal and Plaintiff attended an interview with the USCIS on March 24, 2021 (the "2021 interview").  (*Id.* at AR000144)

During the 2021 interview, Lawal gave yet another account of her past residential history. (*Id.* at AR000050)  This time, she stated that while Muhammad worked at Fortress, he stayed at Fortress or lived with Lawal in Philadelphia and commuted to Baltimore to work—and that when Muhammad lost his job at Fortress, he began living with Lawal in Philadelphia.  (*Id.*)  She disclosed that she had lived with Muhammad about 50% of the time.  (*Id.*)  Lawal also denied ever living with Ajayi and stated that he was like an "uncle" to her.  (*Id.*)

On April 19, 2021, the USCIS issued a Notice of Intent to Deny ("NOID") Balogun's petition pursuant to Section 204(c), based on its prior finding that Lawal had previously attempted to evade immigration laws by entering into a sham marriage with Muhammad. (*Id.* at AR000045) Plaintiff's counsel contested the NOID, submitting in support a letter and documents including text messages, affidavits, photographs, paystubs, and Muhammad's Social Security card and driver's license. (*Id.* at AR000042-44)

### 3.    The USCIS's denial of Balogun's petition

On July 12, 2021, the USCIS issued a decision denying Balogun's petition (the "USCIS denial") pursuant to Section 204(c). (*Id.* at AR000026-41) The USCIS denial was based on the following:

- Muhammad's and Lawal's inconsistent testimony regarding their residential history, from which it appears that Muhammad and Lawal "had not lived together at any point throughout their marriage" and had "led separate lives" which reflects that they "never intended to establish their life together at the time of their marriage." (*Id.* at AR000034-35);

- Lawal had a child with Ajayi during her marriage to Muhammad, and Lawal and Muhammad each misrepresented their relationships with Ajayi during the various interviews. (*Id.* at AR000035-36) "The fact that they both felt it necessary to try and deceive USCIS about this further bolsters USCIS's finding that their marriage was a sham." (*Id.* at AR000036);

- Lawal had misrepresented her identity in connection with the Laguda and Lawal applications, and continued such misrepresentations in filing Form I-751 and I-485 petitions and in subsequent interviews regarding those petitions. (*Id.*) These misrepresentations "again call[] into question her credibility regarding her relationship with [] Muhammad." (*Id.*); and

9

- The documents submitted in support (which included an undated statement from Muhammad, an affidavit from a third party, lease agreements, bank account statements, life insurance policies, utility bills, copies of credit, debit and gas cards, joint income tax returns, health insurance documents, emergency contact documentation and photographs of Muhammad and Lawal together in public) have "diminished evidentiary value" in light of Lawal's untruthfulness regarding her residential history, her relationship and child with Ajayi and her student visa applications.  (*Id.* at AR000036-38)  "The credibility of the documents is questionable and appear to be actions taken to create documentary evidence with no intent to comingle their lives."  (*Id.* at AR000038)

In light of these findings, the USCIS concluded that there was "substantial and probative evidence" that Lawal's marriage to Muhammad was a "sham marriage [entered into] to circumvent [] immigration laws."  (*Id.* at AR000040-41)

### 4.    The BIA's affirmance of the USCIS denial

On August 4, 2021, Plaintiff appealed the USCIS denial to the BIA.  (*Id.* at AR000021)

On July 18, 2023, the BIA issued a decision analyzing Plaintiff's arguments, and ultimately dismissing Plaintiff's appeal and adopting and affirming the USCIS denial.  (*Id.* at AR000003-4)

The BIA concluded that the approval of Balogun's petition was barred by Section 204(c).  (*Id.* at AR000003)  The BIA addressed Balogun's arguments on appeal as follows:

- With respect to Balogun's assertion that consideration of Lawal's affair and child with Ajayi was improper, the BIA noted that "[t]he fact that [Lawal] attempted to conceal that fact from USCIS . . . is substantial and probative circumstantial evidence that her prior marriage was entered into to evade immigration laws."  (*Id.* at AR000003-4);

- With respect to Balogun's claim that it was improper for the USCIS to consider Lawal's conduct in applying for the Laguda application in 2001 when evaluating whether her prior marriage was bona fide, and that this conduct has limited effect on Lawal's credibility, the BIA explained

10

that Lawal's "concealment of her prior fraudulent usage of another name and identity to enter the United States provides another basis to support [the USCIS's] finding" regarding Lawal's lack of credibility, "which directly cuts against any claims she made concerning the bona fides of her prior marriage." (*Id.* at AR000004); and

• As for Balogun's argument that the USCIS erred in assessing the probative value of the documentary evidence that Lawal submitted in support of the legitimacy of her prior marriage, the BIA stated that the USCIS properly assigned little weight to the evidence, as it "provides little to no meaningful insight into the nature of the couple's marriage in light of the [other] derogatory evidence[.]" (*Id.*)

## C.    Procedural Background

On October 16, 2023, Plaintiff filed a Complaint in this Court seeking judicial review of the BIA's decision. (D.I. 1)  On April 1, 2024, Defendants filed their motion for summary judgment, (D.I. 10), and briefing was completed on August 30, 2024, (D.I. 24).[3]

## II.    STANDARD OF REVIEW

The Court has jurisdiction to review the BIA's decision under 28 U.S.C. § 1331.  The United States Court of Appeals for the Third Circuit has held that district courts have jurisdiction under the Administrative Procedure Act ("APA") to review BIA decisions other than final orders of removal. *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014).

When a party seeks review of agency action under the APA, the district courts sits as an appellate tribunal and the entire case on review constitutes a question of law. *Watson*, 2024 WL 3159320, at *3.  While summary judgment is the proper mechanism for deciding, as a matter, of law, whether the agency's action is supported by the administrative record, the usual summary

---

[3]    On September 5, 2024, United States District Judge Maryellen Noreika referred the motion to the Court for resolution. (D.I. 25)

judgment standard does not apply. *Id.*; *see also Elnahas v. Bausman*, No. 5:21-cv-01979, 2022 WL 1291514, at *2 (E.D. Pa. Apr. 29, 2022); *Bintz v. Fed. Emergency Mgmt. Agency*, 413 F. Supp. 3d 349, 360 (D. Del. 2019). Instead, under the APA, a district court may only set aside an agency's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also Eid*, 740 F.3d at 122; *Elnahas*, 2022 WL 1291514, at *2. This is a "deferential standard that presume[s] the validity of agency action." *SBC Inc. v. FCC*, 414 F.3d 486, 496 (3d Cir. 2005) (internal quotation marks and citation omitted).

Generally, an agency's action is arbitrary and capricious where:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*CBS Corp. v. FCC*, 663 F.3d 122, 137 (3d Cir. 2011). An agency's ruling is not arbitrary and capricious where the agency "reach[ed] its decision by examin[ing] the relevant data . . . [and] articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks and citations omitted). The scope of review under the arbitrary and capricious standard is narrow, and a court may not substitute its own judgment for that of the agency. *Id.* Nor can a court re-weigh the evidence; rather, it must determine only if "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Smith v. Holder*, 487 F. App'x 731, 733 (3d Cir. 2012) (internal quotation marks and citation omitted); *see also Sheng v. Att'y Gen. of U.S.*, 365 F. App'x 408, 410 (3d Cir. 2010) (the agency's findings must be upheld "unless the evidence not only supports a contrary

conclusion, but compels it") (internal quotation marks and citation omitted).  In performing this inquiry, the Court's review is limited to the administrative record that was before the agency at the time that it issued its decision.  *Minto v. U.S. Off. of Pers. Mgmt.*, 765 F. App'x 779, 783-84 (3d Cir. 2019); *Mukui*, 2020 WL 3265156, at *6.

III.    **DISCUSSION**

Plaintiff argues that Defendants' motion must be denied (and the case remanded to the BIA) because the BIA's denial of Balogun's petition:  (1) was not supported by substantial and probative evidence of marriage fraud; and (2) violated Balogun's due process rights.  (D.I. 22 at 9-16)  The Court will take up these arguments in turn.

A.    **Whether the denial of Balogun's petition was supported by substantial and probative evidence of marriage fraud**

Plaintiff asserts that the USCIS's and BIA's decision that Lawal's and Muhammad's marriage was fraudulent was arbitrary and capricious, in that the finding was based on no direct evidence and only "minimal circumstantial evidence[.]"  (D.I. 22 at 13)

As an initial matter, the Court notes that direct evidence (such as a sworn statement by a spouse admitting that the marriage is fraudulent) is not required for a finding of marriage fraud. *Keita v. Barr*, CIVIL ACTION NO. 19-980, 2019 WL 5551425, at *5 (E.D. Pa. Oct. 28, 2019); *Matter of P. Singh*, 27 I. & N. Dec. at 608.  Instead, in some cases, the quality and quantity of circumstantial evidence alone is sufficient to establish marriage fraud under Section 204(c). *Keita*, 2019 WL 5551425, at *5; *Matter of P. Singh*, 27 I. & N. Dec. at 608.  For example, "evidence that the parties knowingly and deliberately attempted to mislead or deceive immigration officials regarding their cohabitation, joint finances, or other aspects of the marriage strongly indicate fraud." *Shah v. U.S. Citizenship & Immigr. Servs.*, Civil Action No. 3:21-cv-

13

2798-E, 2023 WL 2753987, at *4 (N.D. Tex. Mar. 30, 2023) (quoting *Matter of P. Singh*, 27 I. & N. Dec. at 609). In this case, the USCIS's underlying decision was based on circumstantial evidence.[4]

Balogun levies four primary attacks on the USCIS's and BIA's consideration of the relevant circumstantial evidence. For the reasons set out below, none of those attacks are persuasive.

First, Balogun faults the USCIS and the BIA for placing "significant weight" on Lawal's and Muhammad's contradictory testimony regarding their residential history. Balogun asserts that, as to this issue, the USCIS's findings with respect to Lawal's Form I-751 petition and with regard to Balogun's Form I-130 petition contained "internal contradictions[.]" (D.I. 22 at 10) More specifically, Balogun notes that when it denied Lawal's petition, the USCIS stated that on March 12, 2012, Lawal and Muhammad had testified that they never lived together and always maintained separate lives apart from each other. (*Id*. at 10-11 (citing Tr. at AR000267)) But Balogun asserts that when the USCIS denied his petition in this case, the agency made no mention of Lawal's and Muhammad's prior testimony about their residence history; Balogun argues that USCIS's failure to reference this testimony denied him the opportunity to refute any assertion that Lawal and Muhammad had been untruthful in this regard. (*Id.*) But, as

---

[4]    In a brief aside, Plaintiff seems to suggest that to the extent that the anonymous tip letter could be said to constitute direct evidence of marriage fraud, it is not credible because it referred to an unknown person (Bamidele Lawal) as Lawal's sham husband instead of Muhammad. (D.I. 22 at 10) However, while the USCIS noted that the tip letter had kicked off a marriage fraud investigation by the FDNS, the letter itself was not cited by the USCIS as a substantive reason as to why it denied Balogun's petition; therefore, the letter does not appear to have been relied upon as direct evidence of marriage fraud. (Tr. at AR000034-41, AR000051-54, AR000271-76)

Defendants retort, (D.I. 24 at 4 n.3), this assertion is flat out wrong.  The USCIS denial of

Balogun's Form I-130 petition states that:

> [I]t appears that [] Muhammad and [Lawal] had not lived together
> at any point throughout their marriage.  The March 12, 2012 []
> interview revealed the true nature of their relationship in that they
> had never lived together and had led separate lives.

(Tr. at AR000035)  And prior to noting this, the USCIS's decision laid out Lawal's and

Muhammad's shifting, discrepant testimony with respect to their residential history during their

various interviews.  (*Id.* at AR000034-35)  Courts have understandably found that inconsistent

evidence regarding a petitioner's and beneficiary's living situation can constitute substantial

evidence of marriage fraud.  *See, e.g*, *Sholanke v. U.S. Citizenship & Immigr. Servs.*, 854 F.

App'x 23, 27 (6th Cir. 2021) ("[E]vidence of deliberate deception regarding cohabitation

strongly indicate[s] fraud.") (internal quotation marks and citation omitted); *Simaga v. U.S.

Citizenship & Immigr. Servs.*, Case No. 2:21-cv-5098, 2023 WL 5209531, at *6 (S.D. Ohio Aug.

14, 2023) (noting that the petitioner's and the beneficiary's inconsistent testimony regarding

their residential history supported the USCIS's finding of marriage fraud).  The USCIS and BIA

were certainly justified in drawing that same conclusion here.

Second, Balogun faults the USCIS for determining, "without explanation[,]" that the

documentary evidence he and Lawal submitted regarding Lawal's marriage to Muhammad

(including Balogun's and Lawal's affidavits, a third-party affidavit, a letter from Muhammad,

text messages, photographs, IRS filings, joint bank statements, debit cards, insurance policies, a

lease agreement, utility bills and Muhammad's son's criminal record) was not credible.  (D.I. 22

at 11-12)  Again, Plaintiff is wrong.  As Plaintiff's own brief goes on to demonstrate, (*id.* at 12),

the USCIS's decision *did* in fact walk through the various pieces of documentary evidence

submitted by Balogun and Lawal and *did* explain (in quite a lot of detail) why the agency gave

this evidence limited weight, (Tr. at AR000036-38). For example, the USCIS noted that:

- Muhammad's undated letter—in which he states that he is homeless and seeking medical and professional help—contradicts his and Lawal's prior testimony regarding his residential history, (*id.* at AR000036; *see also id.* at AR000050);

- A single affidavit from a third party stating that he was a witness to Muhammad's and Lawal's wedding and that they were a loving couple lacked any substantial details regarding the marriage, (*id.* at AR000036-37; *see also id.* at AR000031);

- Lease agreements had limited evidentiary value in establishing that Lawal and Muhammad lived together at particular addresses, because they did not specify what residence was being leased, because one of the agreements was only signed by Lawal, and because they highlighted other discrepancies in Lawal's and Muhammad's testimony, (*id.* at AR000037; *see also id.* at AR000047, AR000049);

- Balogun's affidavit was not compelling because it was a self-serving statement and he lacked sufficient personal knowledge regarding Lawal's marriage to Muhammad, (*id.* at AR000038);

- Lawal's affidavit was not credible and was unpersuasive for many reasons, including because she failed to sufficiently address certain discrepant testimony that she and Muhammad provided as to their residential history and her relationship with Ajayi, and because Lawal did not refute that she had misrepresented her identity with respect to the Laguda application for a student visa in 2001, (*id.* at AR000038-39);

- While bank account statements, life insurance policies, utility bills and credit, debit and gas cards reflected a shared address, such evidence has limited evidentiary weight because companies and vendors rarely verify that customers actually live where they claim to reside, and such evidence conflicts with the testimony provided by

16

> Muhammad and Lawal regarding their actual residential history, (*id.* at AR000037);

- While joint tax returns reflected a shared address, the Internal Revenue Service does not require taxpayers to provide any evidence of the authenticity of their marriage, (*id.*);

- Health insurance documents reflecting that Muhammad was covered under Lawal's employer's health insurance plan and a letter from her employer indicating that Muhammad was an emergency contact weighed in favor of Plaintiff, but when considered with the totality of the evidence, was not sufficient to prove that Lawal and Muhammad had a bona fide marriage, (*id.*); and

- Photographs of Lawal and Muhammad together in public do not constitute credible, objective evidence that the marriage was bona fide, (*id.*).

Additionally, the USCIS more broadly explained that the credibility of this documentary evidence was questionable when considering Lawal's inconsistent or false testimony regarding: (1) her residential history with Muhammad; (2) her relationship and child with Ajayi; and (3) her submission of the student visa applications. (*Id.* at AR000037-38)  Ultimately, the USCIS concluded that in light of the impact of this prior testimony, the documents at issue appeared to have been an attempt by Muhammad and Lawal to create a false documentary record, hiding the fact that they had no actual intent to commingle their lives. (*Id.*)

In light of the above, it is clear that the USCIS *did* consider the evidence submitted by Balogun and Lawal.  And it is clear that the agency *did* sufficiently explain why this evidence could not overcome the other record evidence indicative of marriage fraud.  On appeal, the BIA rejected Balogun's argument that the USCIS had erred when assessing Plaintiff's documentary evidence—explaining that the USCIS had provided reasoned explanations for its assignment of limited weight to that evidence. (*Id.* at AR000004)

17

The Court agrees that the USCIS's conclusions here (and its weighing of this record evidence) were not arbitrary and capricious.  Nor did they amount to an abuse of discretion.  The Court is not permitted to reweigh the evidence of record, and the fact that the USCIS "did not weigh th[e] evidence in the way the [P]laintiff[] believe[s] it should have is not grounds for [the Court] to overturn [its] findings."  *Mamedov v. Garland*, 20-CV-1063 (ARR) (RML), 2022 WL 426155, at *5 (E.D.N.Y. Feb. 11, 2022); *see also Ali v. United States*, Civil No. 15-cv-201-AJ, 2016 WL 3190190, at *9 (D.N.H. June 7, 2016) ("The USCIS's decision to deny Hassan's I-130 petition adequately discussed the plaintiffs' presented evidence and sufficiently explained why it believed the evidence was unpersuasive. . . . The USCIS's decision . . . articulates that it did not heavily weigh the plaintiffs' submitted evidence (including Lewis's 2008 affidavit) because it largely conflicted with the record and other sworn testimony."), *aff'd*, 849 F.3d 510 (1st Cir. 2017).

Third, Plaintiff contends that while the fact that Lawal gave birth to Ajayi's child during her marriage to Muhammad may demonstrate that she and Muhammad were having marital difficulties, it does not indicate that they did not intend to build a life together at the time of their marriage.  (D.I. 22 at 13)  But Plaintiff cites to nothing in support of this proposition.  As Defendants retort, it is well-settled that "[e]vidence that the parties have other romantic partners, with whom they may have children, is [] a significant consideration, especially when these facts are either not disclosed or are deliberately concealed."  *Matter of P. Singh*, 27 I. & N. Dec. at 609 (*cited in* D.I. 11 at 16; D.I. 24 at 3).  Here, as the USCIS's and BIA's decisions explain, not only did Lawal have a child with Ajayi during her marriage to Muhammad, but there was evidence that Lawal, Muhammad and Ajayi all deliberately misrepresented the nature of the Lawal/Ajayi relationship to investigators.  (Tr. at AR000003-4, AR000035-36)  Thus, these facts

18

were properly considered as circumstantial evidence of marriage fraud in this case. *See, e.g.*, *Elbeialy v. Mayorkas*, Case No. 2:22-cv-02778-ODW (JEMx), 2023 WL 9420529, at *8 (C.D. Cal. Nov. 30, 2023) ("That [the beneficiary] concealed the child [born out of wedlock] and his continuing relationship with Plaintiff from immigration officials is a significant consideration in evaluating the character of [a prior sham] marriage."); *Shah*, 2023 WL 2753987, at *2, *10 (noting that the unrebutted evidence showed that the beneficiary actively attempted to deceive investigators about the fact that he lived with another woman during his marriage, which strongly indicated fraud); *Awan v. Douglas*, Case No. 2:21-cv-00163, 2022 WL 993392, at *10 (D. Utah Apr. 1, 2022) ("Even though the first child [born out of wedlock] was born two years into the marriage, post-marriage evidence can help determine if the marriage was entered into with good faith.").[5]

Fourth, Plaintiff argues that Lawal's alleged misrepresentation of her identity in connection with the Laguda application for a student visa in 2001 was irrelevant to whether Lawal and Muhammad's marriage was bona fide. (D.I. 22 at 13-14) Here again, Plaintiff cites nothing in support of such a proposition (one that would seem to fly in the face of common sense). (*See* D.I. 24 at 5) After all, if a beneficiary made false representations to U.S. immigration authorities in connection with her own visa application, that fact seems potentially

---

[5]        Balogun also asserts that the USCIS failed to "consider the length" of Lawal's 13-year marriage to Muhammad. (D.I. 22 at 12-13) But it is clear from the USCIS's decision that it *did* note the fact that Lawal and Muhammad were married from 2003 until 2016. (Tr. at AR000028-39) What Balogun is really complaining about is that the agency did not *credit* that fact in his favor as part of its decision-making process. But again, it is not the Court's job to re-weigh this and other pieces of the evidentiary record at the appellate stage. And the agency's decision to not give the length of the marriage great weight (in light of the magnitude of the false statements that Muhammad and Lawal had made about that marriage to government officials) was certainly not arbitrary or capricious. (D.I. 24 at 6-7 & n.4)

probative of whether she might later have made false representations to U.S. immigration authorities regarding the nature of her marriage.  (Tr. at AR000004, AR000036); *see, e.g.*, *El-Abaidy v. U.S. Atty. Gen.*, 622 F. App'x 816, 822 (11th Cir. 2015) ("Thus, an [immigration judge] may find an alien's testimony not credible based in part on prior acts of fraud and dishonesty even when the acts were unrelated to the present application."); *Patel v. Johnson*, Case No.: SA CV 15-0032-DOC (JCGx), 2015 WL 12698427, at *2 (C.D. Cal. Oct. 7, 2015) ("In making a marriage fraud determination, USCIS may rely on any relevant evidence, *including evidence having its origin in prior Service proceedings involving the beneficiary*[.]") (internal quotation marks and citation omitted) (emphasis in original).

Moreover, in the instant case, Lawal's prior false statements regarding her visa application were just one piece of a larger puzzle that the USCIS and the BIA considered.  When that evidence is assessed along with Muhammad's and Lawal's inconsistent and changing accounts of their residential histories, and along with their misrepresentations about Lawal's relationship with Ajayi, it is clear that the decision to deny Balogun's petition here was not arbitrary or capricious.  *See, e.g.*, *Akinjiola v. Holder*, Civil Action No. ELH-12-2597, 2014 WL 641702, at *8 (D. Md. Feb. 14, 2014) ("A review of the record reflects that there were important discrepancies in the testimony of Ademuyiwa and McDowell during their respective interviews, in turn supporting the conclusion that their marriage was fraudulent.").

For all of these reasons, the Court recommends that Defendants be granted summary judgment with regard to Balogun's challenge of the denial of his petition under the APA.

### B.    Whether Plaintiff's due process rights were violated

Plaintiff also argues that he has a protected interest in the approval of his petition for his spouse to remain in the United States, and that the process by which his petition was adjudicated

did not afford him due process.  (D.I. 22 at 14-16)  In making this argument, Plaintiff reiterates

his previous assertions that the USCIS and BIA failed to properly consider Plaintiff's

documentary evidence and that the agencies' decisions were based only on minor inconsistencies

in Lawal's and Muhammad's residential histories.  (*Id.* at 15-16)

     Plaintiff's due process argument is fairly easy to dispose of.  The Supreme Court of the

United States has recently examined a similar argument by a United States citizen, who asserted

that her due process rights were violated by the denial of a visa to her noncitizen spouse; the

Supreme Court found that "a citizen does not have a fundamental liberty interest in her

noncitizen spouse being admitted to the country."  *Dep't of State v. Munoz*, 602 U.S. 899, 909

(2024).  Thus, contrary to Plaintiff's argument, he does not have a constitutional right at issue

that would implicate his due process rights.  (*See* D.I. 24 at 7-8)

     And even if Plaintiff could be said to have a protected interest in his spouse remaining in

the country, his due process argument relies on the notion that the BIA failed to properly

adjudicate his petition.  (D.I. 22 at 15-16)  But for the reasons stated above, the Court does not

agree with Plaintiff on that front.  *See, e.g.*, *Elnahas*, 2022 WL 1291514, at *7 ("As this Court

analyzed above, Plaintiffs have failed to establish that USCIS acted arbitrarily or capriciously in

denying Contreras's I-130 petition" and therefore "Plaintiffs cannot prevail in their due process

claim.").[6]

---

[6]    Plaintiff also complains that he has requested but not received a transcript of the
2012 interview, and that summary judgment is not appropriate because he must be given the
opportunity to "conduct discovery" in light of the factual discrepancies in the record.  (D.I. 22 at
16)  But a transcript of the 2012 interview does not exist, (D.I. 24 at 9 & ex. A), and the Court's
review on summary judgment is limited to the existing administrative record unless there is
alleged bias on the part of the agency, *see NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d
182, 195 (3d Cir. 2006).  Plaintiff does not allege any bias here, and has therefore demonstrated
no right to conduct discovery.  *NVE, Inc.*, 436 F.3d at 195-96.

The Court therefore recommends that Defendants be granted summary judgment on Plaintiff's due process claim.

## IV.    CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court recommends that the District Court GRANT Defendants' motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: January 2, 2025

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

22